IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

<table>
<tr><td>MELVIN F. SHERIN, <em>et al.</em>,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>    Plaintiffs,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>        v.</td><td>*</td><td>CIVIL NO.: WDQ-11-3698</td></tr>
<tr><td>JOHN CRANE-HOUDAILLE, INC.,</td><td>*</td><td></td></tr>
<tr><td>  <em>et al.</em>,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>    Defendants.</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

*   *   *   *   *   *   *   *   *   *   *   *   *

MEMORANDUM OPINION

Melvin F. Sherin,[1] individually and as personal

representative of the Estate of Roberta L. Sherin, sued Union

Carbide Corporation ("Union Carbide")[2] in an asbestos-related

---

[1] Also named as Plaintiffs in the Complaint are Ms. Suzette
Desser and Ms. Stephanie Love, surviving children of Mrs.
Sherin. *See* ECF No. 2.

[2] Mr. Sherin also sued John Crane-Houdaille, Inc., Owens-Illinois
Glass Co., E.L. Stebbing & Co., Hampshire Industries, Inc.,
Premier Refractories, Inc., The Goodyear Tire & Rubber Company,
MCIC, Inc., CBS Corporation, General Electric Company,
Metropolitan Life Insurance Company, A.W. Chesterton Company,
CertainTeed Corporation, Kaiser Gypsum Company, Inc.,
International Paper Company, Bayer CropScience, Inc., Cooper
Industries, Inc., Pfizer Corporation, Schneider Electric USA,
Inc., The Wallace & Gale Asbestos Settlement Trust, Conwed
Corporation, Foster Wheeler Corporation, Hopeman Brothers, Inc.,
Selby, Battersby & Company, Green, Tweed & Co., Wayne
Manufacturing Corporation, and Lofton Corporation. *See id.* at
1-8.
    This Court previously granted joint motions for voluntary
dismissal of all claims against Pfizer Corporation, Premier
Refractories, Inc., The Goodyear Tire & Rubber Company, The
Wallace & Gale Asbestos Settlement Trust, MCIC, Inc., E.L.

product liability action.   Pending are Union Carbide's motion *in limine*, ECF No. 179, motion for summary judgment, ECF No. 178, and motion for partial summary judgment, ECF No. 181.   For the following reasons, the motions will be granted in part and denied in part.

I.   Background[3]

    A.   Facts

        1.   Exposure to Asbestos Dust

This case arises from Mrs. Sherin's fatal mesothelioma, allegedly caused by asbestos fibers she inhaled during the construction of her home and while washing the clothing Mr.

---

Stebbing & Co., Foster Wheeler Corporation, Schneider Electric USA Inc., Bayer CropScience, Inc., and General Electric Company. *See* ECF Nos. 60, 100, 102, 123, 131, 132, 149, 150, 156, 161.

    This Court previously granted motions for voluntary dismissal filed by Hampshire Industries, Inc., Hopeman Brothers, Inc., Lofton Corporation, and Wayne Manufacturing Corporation. *See* ECF Nos. 126, 127.

    This Court previously granted motions for summary judgment filed by Hampshire Industries, Inc., Hopeman Brothers, Inc., Lofton Corporation, Wayne Manufacturing Company, Kaiser Gypsum Company, Inc., CertainTeed Corporation, Selby, Battersby & Company, Foster Wheeler Corporation, Pfizer Corporation, Schneider Electric USA, Inc., General Electric Company, The Wallace & Gale Asbestos Settlement Trust, The Goodyear Tire & Rubber Company, Conwed Corporation, CBS Corporation, John Crane-Houdaille Inc., Cooper Industries, Inc., Green, Tweed & Co., and International Paper Company. *See* ECF Nos. 157, 167, 169, 189, 190, 191, 192, 193, 194, 195, 196, 197.

[3] For the motion for summary judgment, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Sherin wore while visiting construction sites as a carpet salesman. *See* ECF Nos. 2, 183 at 1.[4]

In 1968, Mr. and Mrs. Sherin bought an undeveloped lot at 8528 Brattle Road, Pikesville, Maryland. ECF No. 183 at 4. In the spring of 1969, construction of their new home ("Brattle Road") began; it was completed in early 1970. *Id.* Mr. and Mrs. Sherin visited the Brattle Road construction site every day for almost one year. ECF Nos. 182 at 3, 183-2 at 22. Each visit lasted between 20 and 90 minutes. ECF No. 183-2 at 23.

While at the site, Mr. Sherin saw buckets of "Georgia-Pacific" and "Gold-Bond"[5] joint compound. ECF Nos. 183 at 4, 183-2 at 26-28. Mr. Sherin described the buckets as "black," "bluish-white," and "white" plastic and metal. ECF No. 183-2 at 26-28. Contractors used the joint compound to tape the seams of the drywall sheets and then sanded the joint compound. *Id.* at 25.[6] Mr. Sherin saw "tremendous" clouds of dust generated by this work. ECF Nos. 183 at 4, 183-2 at 25-26. Mrs. Sherin

---

[4] Union Carbide sold asbestos to product manufacturers, which sold finished products to suppliers; the suppliers sold the products to contractors; these contractors used the products that exposed Mrs. Sherin to asbestos at the new home and on Mr. Sherin's clothing. *See* ECF No. 178-1 at 16.

[5] National Gypsum manufactured "Gold Bond" joint compound. *See* ECF No. 183-11 at 2.

[6] According to Mr. Sherin, drywall installation took about eight to nine weeks to complete. *See* ECF No. 183-2 at 25.

would sweep the dust off the floor so that their children could sit and play. ECF No. 183-2 at 15, 25-26.

From 1968 to 1976, Mr. Sherin was a sales representative for Crown Products, a carpet manufacturer, covering Maryland, Northern Virginia, and the District of Columbia. *Id.* at 10-12.[7] Mr. Sherin visited eight to ten construction sites each month; he ultimately visited "hundreds" of sites. *Id.* at 42, 49, 53. While at the sites, Mr. Sherin saw buckets of "Georgia-Pacific" and "Gold Bond" joint compound being used "[m]any times." *Id.* at 54, 57. Dust from the construction sites adhered to his outer clothing, some of which was washed by Mrs. Sherin. *Id.* at 48, 52, 55.

Doctors Abraham and Kipen testified about Mrs. Sherin's mesothelioma. *See* ECF Nos. 183-19; 183-20. Dr. Abraham testified that "[i]f laundering [Mr. Sherin's] clothes created aerosolized asbestos fibers that she inhaled, that would be part of her cumulative exposures and part of the causation of her mesothelioma." ECF No. 183-19 at 14. Dr. Abraham also testified that every exposure would be a contributing cause, and that each exposure increases the risk of mesothelioma because

---

[7] Mr. Sherin sold carpet padding, indoor-outdoor carpeting, polypropylene indoor-outdoor carpeting, and synthetic grass carpeting. *See* ECF No. 183-2 at 37. He did this, in part, by visiting worksites to convince the builder to install these products at the builder's next construction location. *See id.* at 36.

"there is a dose-response relationship."  *Id*.  At 11-12.  Dr.
Kipen characterized Mrs. Sherin's exposure as "substantial
domestic exposure" as a result of her laundering of Mr. Sherin's
clothes for many years.  ECF No. 183-20 at 7.[8]  He opined that
Mrs. Sherin's mesothelioma resulted from her "cumulative
exposure to asbestos dust."  *Id*. at 5-6.

### 2.   Union Carbide's Sales

Between 1963 and 1985 Union Carbide sold raw chrysotile
asbestos fiber referred to as "SG-210" or "Calidria" to third-
party manufacturers--including Georgia-Pacific and National
Gypsum--who incorporated it into their products.  *Id*. at 2.

Sales to Georgia-Pacific began in the late 1960s[9] or early
1970s.  *See* ECF No. 183-6 at 119-122.  Until 1973, Georgia-
Pacific manufactured "Ready Mix" joint compound and supplied the
Baltimore area from its Akron, New York plant.  ECF No. 183-10
at 7-8.  Thereafter, manufacturing for the Baltimore area
shifted to Georgia-Pacific's Milford, Virginia plant.  *Id*.
Until 1970, the various Ready Mix formulas contained asbestos
supplied by Phillip Carey.  ECF No. 183-8 at 10.  After

---

[8] In forming this opinion, however, Dr. Kipen took into account a
total of 17 years of domestic exposure.  *See* ECF No. 183-20 at
7.

[9] Based on a Calidria brochure dated 1968.  *See* ECF No. 183-6 at
120.

September 1970, all Ready Mix formulas used Calidria supplied by Union Carbide.  *Id.*[10]

There is conflicting evidence about when National Gypsum, the manufacturer of "Gold Bond" joint compound, began using Calidria.  Responses to interrogatories in a prior case stated that--"around 1967"--National Gypsum began using Calidria.  ECF No. 183-11 at 9.  Interoffice correspondence from National Gypsum's Long Beach, California, plant states that--in 1968--National Gypsum began testing Calidria as a replacement asbestos fiber.  ECF No. 186-16 at 2.[11]  Donald Doty, a former National Gypsum employee, testified that--as of early 1969--National Gypsum used SG-210 exclusively in its joint compound formula. ECF No. 183-13 at 15.  However, Doty's testimony consisted of him reading from a Regional Plant Manager's Meeting Report about National Gypsum's West Coast operations.  ECF Nos. 186-1 at 2-3, 183-14 at 5-6.  National Gypsum supplied the Baltimore area from its Baltimore plant.  ECF Nos. 186 at 4 n.6, 186-1 at 6.

National Gypsum business records show substantial sales of Calidria from Union Carbide to National Gypsum's Baltimore

---

[10] Though Mr. Sherin has produced evidence that--from 1968 to 1975--Ready Mix formulas used SG-210, ECF No. 183-15, evidence of formulas used at the Akron plant only indicated use of SG-210 in 1972, ECF No. 183-8 at 147.  The Milford plant used SG-210 in Ready Mix from June 1973 until at least January 1975.

[11] The correspondence was signed by Donald Doty, then a service engineer at the Long Beach plant. *See* ECF No. 183-16 at 3; *see also* ECF No. 183-13 at 10-11.

plant.  ECF No. 183-18.  The earliest recorded sale was in April 1969.  *Id.* at 23, 42.  Almost all the invoices, however, are dated 1971 to 1975. *See generally id.*

> 3.   Union Carbide's Awareness of the Dangers of
>        Asbestos Exposure and its Warnings to Customers

Controversy about the safety of asbestos dates from the 1940s.  *See* ECF No. 183-24 at 6.[12]  A 1947 Report of Preliminary Dust Investigation ("Dust Investigation Report") prepared by the Industrial Hygiene Foundation of America, Inc. ("IHF"), of which Union Carbide is allegedly a founding member, stated that information available at that time "[did] not permit complete assurance that five million [particles per cubic foot][13] is thoroughly safe nor has information been developed permitting a better estimate of safe dustiness."  ECF No. 183-25 at 4, 23. The Dust Investigation Report urged further study to measure "any remaining hazard in the dust zone below five million for

---

[12] Internal Union Carbide correspondence dated May 12, 1975 states that "We have been aware of the hazardous potentials of asbestos consistent with the state of medical and toxicological knowledge at any particular time . . . ." ECF No.  183-21 at 4. The correspondence also says that Union Carbide has subscribed to a range of "journals, abstracts, and indices" related to asbestos as an industrial mineral "since the Corporation was formed in 1917 at all of our locations."  *Id.*

[13] The Dust Investigation Report addressed, *inter alia*, the five million particles per cubic foot maximum allowable concentration standard for asbestos dust recommended by the American Conference of Governmental and Industrial Hygiene. *See* ECF Nos. 183-25 at 22; 183 at 15.  This standard later became known as the "Threshold Limit Value" or "TLV."  *See* ECF No. 183 at 15.

the elimination of future asbestosis depends upon the degree of control effected now." *Id.*

In 1956, Henry Field Smith, Jr., Ph.D., authored a journal article for Union Carbide and the Mellon Institute, in which he stated that threshold limits and maximum allowance concentrations were misleading. *See* ECF no. 183-29 at 3. According to Dr. Smith, the use of such terms suggested that "human response" to exposures less than those amounts would be "negligible," when "no such description can truthfully attach[] to most of them." *Id.*

In 1965, Union Carbide prepared an internal memorandum in response to news reports concerning the possible carcinogenic properties of asbestos. *See* ECF No. 183-32. The memorandum recommended that personnel responding to customer inquiries after the news reports refer to an Asbestos Toxicology Report ("Toxicology Report") prepared by Union Carbide's Director of Toxicology, Dr. C.U. Dernehl. *See id.* at 1. The Toxicology Report states that although "[i]t has been known for many years that some persons working in asbestos production were prone to develop a disabling lung disease," "a man can work a 40-hour week for a lifetime without developing asbestosis" if exposures

were kept below five million particles per cubic foot.  *See id.*
at 3.[14]

In 1967, I.C. Sayers prepared a report for Union Carbide in
the United Kingdom, titled "Asbestos as a Health Hazard in the
United Kingdom" ("Sayers Report").  *See* ECF No. 183-36.  The
Sayers Report states that mesothelioma is associated with
inhaling asbestos; that "[m]esothelioma is the most disturbing"
of diseases attributable to asbestos; and that it can occur
after "brief exposure," possibly as low as "three months," or,
according to "[s]ome authorities[,] . . . a single brief
exposure might be sufficient."  *Id*. at 11.  The Sayers Report
also mentions an article published on October 31, 1965, by the
*Sunday Times*, describing a dock worker's wife who died of
mesothelioma; her only exposure to asbestos was from washing her
husband's work clothes.  *See id.* at 4.

In June 1967, Dr. Dernehl reviewed the Sayers Report,
finding it "reasonably accurate."  ECF No. 183-38 at 1.  Dr.
Dernehl stated that "[i]t is probable that the 5 million

---

[14] Similarly, in response to newspaper articles published in
early 1966, Union Carbide recommended that personnel responding
to concerned customers refer to Dr. Dernehl's Toxicology Report
emphasizing the five million parts per cubic foot Threshold
Limit Value and the lack of "incontrovertible proof of a
relationship between cancer and asbestos."  ECF No. 183-30 at 1.
In October 1968, Union Carbide reiterated the safety of asbestos
dust up to the TLV in its brochure advertising the sale of
Calidria.  *See* ECF No. 183-41.

particles per cubic foot will not be acceptable for the prevention of mesothelioma." *Id*. at 2.

In May-June 1972, the Occupational Safety and Health Administration ("OSHA") published "Asbestos: Airborne Danger" ("Asbestos Article"). *See* ECF No. 183-55. The Asbestos Article states that incidences of mesothelioma are "now appearing at an unprecedented rate," and "[r]esearchers are linking it to asbestos exposure, however slight." *Id*. at 6. The Asbestos Article further states that "[a]sbestos contamination holds an increasing threat to the general public." *Id*. at 8. "Unsuspecting passers-by in the vicinity of construction sites or families of workers who return home with dusty clothing are among those exposed to this hazard." *Id*.

In May 1973, Union Carbide's Medical Department sent a letter to its Law Department citing the Medical Department's disagreements with various conclusions drawn by the Mining and Metals Division following its Calidria Asbestos study. *See* ECF No. 183-59. The Medical Department compared the Mining and Metals Division's conclusions with criteria for asbestos exposure set by the National Institute of Occupational Safety and Health ("NIOSH"). *See id*. at 1. The Medical Department stated:

- In response to the conclusion by Mining and Metals Division that asbestosis and lung cancer occurred only in

10

workers with longterm exposure to large amounts of dust,

NIOSH had reported positive x-ray findings of asbestos

exposure in individuals known to be exposed for just one

day and had referenced "earlier data of family cases with

reasonably short and/or low levels of exposure";  and

- In response to the conclusion that "there is no evidence

that the general public is in any danger from the amount

of asbestos fiber in the community air," NIOSH had

previously stated that "some question may be raised of a

possible neighborhood exposure."

See id. at 1-2, 4-5.  The Medical Department also noted that

various slides produced by the Mining and Metals Division were

"misleading" or contained "half-truths."  Id. at 6-7.

Beginning in 1968, Union Carbide included warnings on its

bags of Calidria asbestos[15] and--in 1972--it modified the warning

to comply with newly-enacted OSHA regulations.  See ECF No. 178-

1 at 18.  Georgia-Pacific employees who handled bags of Calidria

asbestos testified that they did not recall seeing any warnings

printed on the bags or receiving information from Union Carbide

about the health hazards of asbestos.  See ECF Nos. 183-73 at 3;

183-74 at 2.  Union Carbide no longer has any of the bags that

---

[15] Union Carbide internal correspondence states that the 1968
labeling used on its asbestos packaging was "weak."  See ECF No.
183-79 at 31.

were used during the time it sold Calidria through 1985. *See* ECF No. 183 at 29.

Beginning in 1964, Union Carbide provided its Asbestos Toxicology Report to all customers. *See* ECF No. 178-4 at 5, 9. Union Carbide also provided its customers with various regulations, reports, and literature on the topic of health risks associated with asbestos. *See id*. The 1967 Sayers Report, however, was not distributed to customers. *See* ECF No. 183-39 at 18.

In 1972, Union Carbide began providing customers with its Material Safety Data Sheet about Calidria asbestos ("Calidria Data Sheet"). *Id*. The Calidria Data Sheet stated that Calidria contained no hazardous ingredients, although it provided guidance on airborne exposure to asbestos and noted that "[p]rolonged overexposure may result in lung damage." ECF No. 183-56.

Also in 1972, Union Carbide's Mining and Metals Division recommended responding to customer concerns about asbestos by stating that "[a]sbestos is proven harmful only when TLV's are exceeded for 10-30 years" and that "[i]t is not a proven fact that asbestos dust causes cancer when regulations are observed." ECF No. 183-50 at 1.

In 1973, Union Carbide internal correspondence directed personnel to inform customers that "asbestos is not a

carcinogen" under OSHA regulations, and stated that "[a]s you know, the answer to the same question in the broad sense is not as clear-cut," and medical opinion varies from "[a]sbestos is a very dangerous carcinogen" to "[u]nder certain exposure conditions certain types of asbestos may be carcinogenic."  ECF No. 183-60 at 1.

In the early 1970s, Union Carbide employees who visited customers completed a "Report of Call."  *See* ECF Nos. 45-49. Two Reports of Call suggest that Union Carbide customers were dissatisfied with the asbestos-related information they had received.  *See* ECF Nos. 183-45, 183-49.  One Report of Call states that a customer complained that "the only information that Carbide has furnished him with regard to this subject in print is our Asbestos Toxicology report and some information concerning methods and equipment for determining dust levels." ECF No. 183-49 at 1.  The customer described the Asbestos Toxicology Report as "atrocious," said that it posed more questions than it answered, and requested more specific recommendations for safe use of Calidria.  *Id*.

B.    Procedural History

On December 21, 2011, Mr. Sherin sued Union Carbide, and others,[16] under various theories of recovery.[17]  ECF No. 2.  On

---

[16] *See supra* note 2.

September 30, 2013, Union Carbide moved *in limine* to exclude

hearsay and speculative product identification testimony.  ECF

No. 179.  Also on September 30, 2013, Union Carbide moved for

summary judgment on all claims, based on lack of evidence of

causation or duty, ECF No. 178, and moved for partial summary

judgment on the issues of breach of warranty, fraud, conspiracy,

aiding and abetting, and punitive damages, ECF No. 181.  On

October 18, 2013, Mr. Sherin opposed the motion *in limine*, ECF

No. 182, and the motion for summary judgment, ECF No. 183.[18]  On

November 4, 2013, Union Carbide replied.  ECF Nos. 185, 186.

---

[17] Count One alleged Strict Liability; Count Two--Breach of
Warranty; Count Three--Negligence; Count Four--Fraud; Count
Five--Conspiracy; Count Six--Market Share Liability; Count
Seven--Loss of Consortium; and Count Eight--Wrongful Death.  *See*
ECF No. 2.  The Short Form Complaint submitted by Mr. Sherin
incorporates by reference a Master Complaint filed in personal
injury asbestos cases in which the Plaintiff is not a tradesman
or steelworker.  *See* ECF No. 5.  The Master Complaint alleges,
*inter alia*, strict liability based on defective design and/or
construction (Count One, Paragraph Four) and failure to warn
(Count One, Paragraphs Five and Six).  The Master Complaint also
alleges, *inter alia*, negligence based on failure to properly
design and/or construct their asbestos products (Count Three,
Paragraph 17(a))and failure to warn or otherwise advise
Plaintiff about the dangers of asbestos (Count Three, Paragraph
17(b) - (f).  *See id*.

[18] The motion for partial summary judgment, ECF No. 181, is
unopposed.

II.  Analysis

    A.   Union Carbide's Motion *in Limine*

    Union Carbide asserts that Mr. Sherin's testimony should be
excluded because it is speculative and inadmissible hearsay. *See*
ECF 179-1.

        1.   Personal Knowledge

    Union Carbide asserts that Mr. Sherin's testimony is
"unfounded" and "speculative" because he did not purchase or use
the buckets, and that he is "simply guessing about what was in
them and who made them." ECF Nos. 179-1 at 2, 4, 185 at 3.  Mr.
Sherin asserts that his eye-witness product identification
testimony meets the foundational requirements of Federal Rule of
Evidence 602.  *See* ECF No. 182 at 3-4.

    Under Rule 602, a witness may not testify about matters
outside his personal knowledge.  Testimony should be excluded
for lack of personal knowledge only when "in the proper exercise
of the trial court's discretion it finds that the witness could
not have actually perceived or observed that which he testifies
to."  *MBAFB Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 681
F.2d 930, 932 (4th Cir. 1982); *see also United States v. Martin*,
29 Fed. App'x 178 (4th Cir. 2002) (unpublished) (affirming
admissibility of lay testimony identifying controlled substances
with which the defendants were charged).

Here, Mr. Sherin testified that he and Mrs. Sherin visited the construction site of their new home each day for nearly one year. ECF No. 182 at 3. During that time, he frequently saw "clouds of visible dust" generated by the sanding of joint compound contained in buckets labeled "Georgia-Pacific" and "Gold Bond." *Id.* Mr. Sherin also testified that he observed those same buckets at "'hundreds' of construction sites in Maryland, Virginia, and Washington D.C." while working as a sales representative for Crown Products. *Id.*

There has been no showing that it was "nearly impossible" for Mr. Sherin to "actually perceive[] or observe[]" the buckets labeled "Georgia-Pacific" and "Gold Bond." *See MBAFB Fed. Credit Union*, 681 F.2d at 932. "The quality of a witness's observations is not an issue for foundations; it is a matter for impeachment." *Adkins v. Dirickson*, 523 F. Supp. 1281, 1284-85 (E.D. Pa. 1981). Mr. Sherin's testimony meets the requirements of Rule 602. Accordingly, the Court will deny Union Carbide's motion *in limine* to exclude Mr. Sherin's testimony as speculative.

2.   Hearsay

Union Carbide argues that Mr. Sherin's product identification testimony asserts that "the buckets contained joint compounds made by Georgia-Pacific, National Gypsum, and U.S. Gypsum," and, thus, is barred by the rule against hearsay.

16

ECF No. 179-1 at 4.   Mr. Sherin argues that his testimony is not

hearsay because it is not offered "to prove the *contents* (the

actual ingredients) of the materials contained in the buckets,"

but is "circumstantial evidence of the joint compounds'

*manufacturers*."   ECF No. 182 at 7.

Hearsay is an out-of-court statement offered in court to

prove the truth of the matter asserted in the statement.   Fed.

R. Evid. 801(c)(1).   A statement is an oral or written assertion

or nonverbal conduct "if the person [making the statement]

intended it as an assertion."   Fed. R. Evid. 801(a).   Hearsay is

generally inadmissible unless an exception applies.   Fed. R.

Evid. 802.   Whether product identification testimony is hearsay

depends on the purpose for which the evidence is offered, *see*

*Commonwealth v. Harvey*, 666 A.2d 1108, 1111 (Pa. Super. Ct.

1995), and is of first impression in this circuit.[19]

One line of cases holds that product labels represent out-

of-court statements subject to the hearsay rules when offered to

prove the contents of the package.   *See Sternhagen v. Dow Co.*,

108 F. Supp. 2d 1113, 1116 (D. Mont. 1999) (testimony that

plaintiff saw "defendants' labels on barrels of 2, 4-D" was

---

[19] *Cf. United States v. Heath*, 191 F.3d 449, 449 (4th Cir. 1999)
(per curiam) (mailing labels not hearsay) (*citing United States
v. Lieberman*, 637 F.2d 95, 101 (2d Cir. 1980) (hotel guest card
admissible as non-hearsay to show that guest was registered at
the hotel)).

hearsay); *see also DiCola v. White Bros. Performance Products, Inc.*, 69 Cal. Rptr. 3d 888, 900 (Cal. Ct. App. 2008)[20] (testimony that package label read "Burly Brands" inadmissible hearsay to prove that the package contained a "Burly Brands" model product).[21]

Another line of cases holds that testimony about a product's manufacturer by reference to its label is not a statement subject to the hearsay rules, but is circumstantial evidence of the manufacturer.[22]   *See Bolton v. Air & Liquid Sys.*

---

[20] Interpreting an analogous state rule.  *See* Cal. Evid. Code § 1200(a) (West 2013) ("'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.").

[21] *See also Reemer v. State*, 835 N.E.2d 1005, 1007-09 (Ind. 2005) (list of ingredients labeled on boxes of nasal decongestants hearsay but admissible under "Market Reports, Commercial Publications" exception); *Forler v. State*, 846 N.E.2d 266, 270-71 (Ind. Ct. App. 2006) (accord); *In re T.D.*, 450 N.E.2d 455, 456-59 (Ill. App. Ct. 1983) (in-court reading of label attached to tube of glue was hearsay because label constituted out-of-court declaration by manufacturer regarding contents of the glue; admitted under residual exception to hearsay rules).

[22] These cases use what is known as the "mechanical trace" approach to determining the type of evidence is at issue.  *See United States v. Scott*, No. 2:13CR164, 2014 WL 2808802, at *3 (E.D. Va. June 20, 2014).  Wigmore's treatise on evidence coined the phrase to refer to such things as brands on animals, tags, signs, and license plates. 1 Wigmore §§ 148-157 (3rd ed. 1940). The Ninth Circuit first used the "mechanical trace" approach to hold that a printed name tape attached to a brief case was circumstantial evidence of the case's owner, and not inadmissible hearsay.  *See United States v. Snow*, 517 F.2d 441, 443-45 (9th Cir. 1975).

*Corp.*, No. 2:12-60128-ER, 2013 WL 2477169, at *1 n.1 (E.D. Pa.

Apr. 30, 2013)[23] (hearsay objection to plaintiff's testimony that

packaging was labeled "Buffalo" was "without merit"); *see also*

*Los Angeles News Serv. V. CBS Broadcasting, Inc.*, 305 F.3d 924

(9th Cir. 2002), *amended*, 313 F.3d 1093 (9th Cir. 2002) ("CBS"

logo appearing in the opening frames of a videotape was

circumstantial evidence of the videotape's origin); *Harvey*, 666

A.2d at 1111-12.  *Harvey* involved the sale of liquor to minors;

at trial, the Commonwealth asked the minors to identify the

brand of beer they consumed.  *Id.*  The Court held that because

the testimony sought to establish the beer's manufacturer, and

not its alcohol content, the "label was not an assertion subject

to the hearsay rule."  *Id.* at 1112.

Cases addressing inscriptions about the place of

manufacture are in accord with this view.  *See United States v.*

*Scott*, No. 2:13CR164, 2014 WL 2808802, at *4 (E.D. Va. June 20,

2014) (holding that "Made in China" inscription was

circumstantial evidence that product was made in China and not a

statement by the manufacturer); *United States v. Koch*, 625 F.3d

---

[23] This case was transferred from the United States District
Court for the Northern District of California as part of MDL-875
*In re Asbestos Litigation*.

470, 480 (8th Cir, 2010) ("China" inscription on computer and flash drive labels not inadmissible hearsay).[24]

*Harvey* is instructive because the Court had to determine whether the testimony identified the product's manufacturer or its content. *See id.* at 1111 (stating that "[h]ad the Commonwealth relied upon the Busch label to establish the alcohol content of the beverage, such testimony would have fallen squarely within the dictates of" cases applying the rule against hearsay). Other courts adhering to this view have generally not had to make that distinction. *See United States v. Buchanan*, 604 F.3d 517, 522 (8th Cir. 2010) (matching inscriptions on a key and a safe not hearsay).[25] *But see Hill v. Joseph T. Ryerson & Son, Inc.*, 268 S.E.2d 296, 309-10 (W. Va. 1980) (testimony describing pipe bearing label "RT 1419" hearsay as it "strongly implicate[d]" the identity of the manufacturer;

---

[24] *See also United States v. Thody*, 978 F.2d 625, 631 (10th Cir. 1992) ("Made in Spain" inscription not an assertion by the manufacturer); *United States v. Alvarez*, 972 F.2d 1000 (9th Cir. 1992), *overruled on other grounds sub nom. United States v. Gomez*, 302 Fed. App'x 596 (9th Cir. 2008); *Estates of Tobin by Tobin v. SmithKline Beecham Pharm.*, 164 F. Supp. 2d 1278, 1281, 1289-90 (D. Wyo. 2001) (German warning label not hearsay as not offered to prove the truth of the matter asserted); *United States v. Brown*, No. 4:08CR0006DFHMGN1, 2009 WL 2090193 (S.D. Ind. July 13, 2009) (unpublished).

[25] *See also United States v. Bowling*, 32 F.3d 326, 328 (8th Cir. 1994) (manufacturer's name on a firearm is not a statement and, thus, not subject to hearsay rules).

admitted under the business records exception to the rule against hearsay).

As Mr. Sherin did not testify about the contents of or ingredients in the buckets, this case differs from those finding that testimony about a label was hearsay when offered to prove a container's contents. *See Sternhagen*, 108 F. Supp. 2d at 1116 (testimony hearsay because offered to prove that barrels contained Defendants' 2, 4-D product, and, thus, that plaintiff was exposed to 2, 4-D). For the same reason, this case also differs from those finding that testimony about ingredients on a label was hearsay. *See, e.g.*, *Reemer v. State*, 835 N.E. 2d 1005, 1007-09 (Ind. 2005).

Here, Mr. Sherin has testified that he saw contractors using joint compound in buckets labeled "Georgia-Pacific" and "Gold Bond," and that he saw those buckets while visiting construction sites as part of his job. ECF No. 182 at 3. The bucket labels *imply*, but do not *assert*, that the joint compounds in the buckets were manufactured by Georgia-Pacific and National Gypsum. *See* Binder & Kaye, *The Hearsay Handbook*, Part 1, § 2:4 (4th Ed.) (West 2011). The labels are not assertions subject to the hearsay rules but are circumstantial evidence of the manufacturer identities. *See Harvey*, 666 A.2d at 1112. As with any circumstantial evidence, "[t]he party seeking to avoid the inference for which the evidence is offered must attempt the

explanation and it is for the fact finder to determine whether he succeeds." *United States v. Snow*, 517 F.2d 441, 444 (9th Cir. 1975).

Even assuming that Mr. Sherin's testimony about the bucket labels was hearsay, it would be admissible under the residual exception to the rule against hearsay.[26]

Under Federal Rule of Evidence 807(a), hearsay that is not covered by a specific hearsay exception may be admissible if:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness [as the exceptions contained in Rules 803 and 804];
> (2) it is offered as evidence of a material fact;
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

Although Rule 807 is narrowly construed, *see United States v. Dunford*, 148 F.3d 385, 394 (4th Cir. 1998), "[w]hen the choice is between evidence which is less than best and no evidence at all, only clear folly would dictate an across-the-board policy of doing without." *Morgan v. Foretich*, 846 F.2d 941, 943 (4th Cir.1988) (*quoting* Fed. R. Evid. art. VIII advisory committee's note). Here, all four requirements are met.

First, Mr. Sherin's testimony has circumstantial guarantees of trustworthiness. He saw the buckets many times over an

---

[26] *See* Fed. R. Evid. 807.

eight-year period during the construction of Brattle Road and while visiting construction sites as part of his job, and he described their color and shape. *See* ECF No. 182 at 1, 3, 12.[27] Second, Mr. Sherin's testimony is offered as evidence of a material fact: that Mrs. Sherin was exposed to asbestos-containing joint compound manufactured by Georgia-Pacific and National Gypsum. *See id.* at 12. Third, Mr. Sherin's testimony is more probative than any other evidence that Mr. Sherin can readily obtain. Because 30 years have passed since Mrs. Sherin's exposure, Mr. Sherin has had great difficulty locating physical evidence, records, or other witness testimony. *See id.* at 12-13. Finally, admission of Mr. Sherin's testimony will serve the interests of justice. Direct evidence of exposure to asbestos is often scarce, *see id.* at 13; excluding Mr. Sherin's testimony may result in "no evidence at all," *see Morgan*, 846 F.2d at 943.

Accordingly, even if the bucket labels were construed as assertions subject to the hearsay rules, Mr. Sherin's testimony would be admissible under the residual exception.

---

[27] In addition, "[a]n inscription, sign, tag, or label purporting to have been affixed in the course of business and indicating origin, ownership, or control," such as the bucket labels at issue here, is self-authenticating. Fed. R. Evid. 902(7).

*See Scott*, 2014 WL 2808802, at *4.[28] Therefore, this Court will deny Union Carbide's motion *in limine* to exclude Mr. Sherin's testimony as hearsay.

  B.  Union Carbide's Motion for Summary Judgment

  1.  Legal Standard for Summary Judgment

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);[29] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In considering the motion, the judge's function is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the

---

[28] *See also United States v. Burdulis*, 753 F.3d 255, 262-64 (1st Cir. 2014; *In re T.D.*, 450 N.E.2d at 458 (glue label "sufficiently trustworthy to be an exception" to the hearsay rule; *Moore v. Dir. of Revenue, State of Mo.*, 811 S.W.2d 848, 852-53 (Mo. Ct. App. 1991) (sterility label on needle and vacuum tube "sufficiently reliable and trustworthy on their face to be considered an exception to the hearsay rule"). *DiCola v. White Bros. Performance Products, Inc.*, 69 Cal. Rptr. 3d 888, 900 (Cal. Ct. App. 2008), did not address whether the "Burly Brands" label fell within a recognized hearsay exception as the Plaintiffs did not present such an argument.

[29] Federal Rule of Civil Procedure 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).  The opposing party must produce evidence upon which a reasonable fact finder could rely. *Celotex Corp.*, 477 U.S. at 322-23.  The mere existence of a "scintilla" of evidence is insufficient to preclude summary judgment. *Anderson*, 477 U.S. at 252.

    2.   Union Carbide's Motion

Union Carbide has raised four grounds in its motion for summary judgment. *See* ECF No. 178-1 at 2-3.[30]  In reviewing this

---

[30] Union Carbide also asserts, without citing any authority, that it is entitled to summary judgment because Mr. Sherin "never identified U.S. Gypsum as an alleged source of Mrs. Sherin's Calidria exposure," ECF No. 178-1 at 2 n.4, and apparently was raising the market share theory of liability.  Although Count Six of the Complaint alleges market share liability, *see* ECF No. 2, Mr. Sherin contends that his "claims are not based on the theory of market share liability," but rather "traditional theories of negligence," ECF No 183 at 45.  Maryland does not recognize market share liability. *See Reiter v. AC and S*, Inc.,

motion the Court will apply Maryland substantive law.  *See Erie Railroad v. Tompkins*, 304 U.S. 64 (1938).[31]

> i.   Admissibility of Mr. Sherin's testimony

Union Carbide asserts that it is entitled to summary judgment because Mr. Sherin's testimony is speculative and inadmissible hearsay and, thus, there is no admissible evidence establishing that the joint compounds he saw were manufactured by Georgia-Pacific or National Gypsum.  *See ECF No. 178-1 at 6-7.  As this Court has determined that Mr. Sherin's testimony met the personal knowledge requirement of Federal Rule of Evidence 602, and was not inadmissible hearsay, *see infra* II.A.2, Union Carbide's motion for summary judgment on this basis will be denied.

> ii.   Evidence of Exposure

Union Carbide asserts that it is entitled to summary judgment because, even if Mr. Sherin saw workers using Georgia-Pacific or National Gypsum joint compound, "there is no evidence that any particular joint compound, to which Mrs. Sherin was actually exposed, in fact contained Calidria as an ingredient." ECF No. 178-1 at 8.  Mr. Sherin contends that his testimony

---

947 A.2d 570, 573 (Md. 2008) *aff'd sub nom. Reiter v. Pneumo Abex, LLC*, 8 A.3d 725 (Md. 2010); *see also Lee v. Baxter Health Care Corp.*, 898 F.2d 146 (4th Cir. 1990) (applying Maryland law).

[31] *See also Guaranty Trust Co. v. New York*, 326 U.S. 99, 108-09 (1945); *Sokolowski v. Flanzer*, 769 F.2d 975, 977 (4th Cir.1985).

establishes that--from 1969 to 1970--Mrs. Sherin inhaled

asbestos-containing dust at their Brattle Road home construction

site and--from 1968 to 1976--on the clothes worn by Mr. Sherin,[32]

and that the asbestos was "mined, marketed, and supplied" by

Union Carbide.  ECF No. 183 at 4-6.

In an asbestos products liability action, the plaintiff

must present evidence of exposure to the defendant's asbestos.

*See Reiter v. Pneumo Abex, LLC*, 8 A.3d 725, 729 (Md. 2010);

*Owens-Illinois, Inc. v. Zenobia*, 602 A.2d 1182, 1184 (Md.

1992).[33]  This evidence may be circumstantial.  *Eagle-Picher*

*Indus., Inc. v. Balbos*, 604 A.2d 445, 460 (Md. 1992) (*citing*

*Roehling v. National Gypsum Co. Gold Bond Bldg. Products*, 786

F.2d 1225, 1228 (4th Cir.1986) ("The evidence, circumstantial as

it may be, need only establish that [plaintiff] was in the same

vicinity as witnesses who can identify the products causing the

asbestos dust that all people in that area, not just the product

handlers, inhaled.")).

Mr. Sherin's testimony is circumstantial evidence of Mrs.

Sherin's exposure at the Brattle Road construction site where he

recalled seeing "Georgia-Pacific" and "Gold Bond" joint compound

---

[32] Referred to as "take-home" exposure.

[33] *See also Georgia-Pacific Corp. v. Pransky*, 800 A.2d 722, 724-
25 (Md. 2002) ("[T]he plaintiff must have been in or very near
the presence of the asbestos-containing product and able to
inhale fibers.").

in use.  ECF No. 183-2 at 21-23, 26-28.  Mrs. Sherin was exposed
to asbestos dust when she swept the dust off the floor so that
their children could sit and play.  *Id.* at 15, 25-26.

Mr. Sherin also testified that--from 1968 until 1976--he
visited "hundreds" of construction sites where Georgia-Pacific
and Gold Bond joint compound was used.  *Id.* at 42, 49, 53-54.[34]
When Mr. Sherin returned home, his dusty work clothes were
washed by Mrs. Sherin.  *Id.* at 48, 52, 55.

In addition to evidence of exposure, Mr. Sherin must also
show that the Georgia-Pacific and National Gypsum asbestos dust
contained Calidria asbestos fibers.

a.    Georgia-Pacific

Mr. Sherin supports his assertion that the Georgia-Pacific
joint compound contained Calidria with deposition testimony by
John L. Myers, a former employee of Union Carbide.  *See* ECF No.
183-6.  Myers testified that sales to "that sector of the
market" including Georgia-Pacific began in the early 1970s and
possibly was as early as the late 1960s based on a Calidria
brochure dated October 1968.  *See id.* at 119, 122.

Mr. Sherin also relies on the deposition testimony of
former Georgia-Pacific employees C. William Lehnert, *see* ECF No.

---

[34] Mr. Sherin could not recall specific dates on which he
observed the joint compound, but stated that he saw it "many"
times.  ECF No. 183-2 at 57.

183-8, and Howard A. Schutte, *see* ECF No. 183-10.   According to
Schutte, until 1973, Georgia-Pacific manufactured Ready Mix
supplied to the Baltimore area at its Akron, New York plant.
*See id.* at 7-8.   Thereafter, it was manufactured by Georgia-
Pacific's Milford, Virginia plant.   *Id.*   Lehnert testified,
however, that until September 1970, virtually all the formulas
used to manufacture Ready Mix at the Akron plant used asbestos
produced by Phillip Carey, and that after September, 1970, all
available formulas used SG-210.   ECF No. 183-8 at 10.   Lehnert's
handwritten notes indicate that the Milford plant used SG-210 in
its Ready Mix joint compound from June 1973 at least until
January 1975.   *See* ECF No. 183-9.

> b.   National Gypsum

Mr. Sherin relies in part on National Gypsum's responses to
interrogatories in an earlier asbestos case.   *See* ECF No. 183-
11.   The responses generally state that National Gypsum began
using SG-210 asbestos fiber in its products, including Gold
Bond, "[a]round 1967."   *Id.* at 9.

Mr. Sherin also relies on deposition testimony of Donald
Doty, a former market service manager for National Gypsum, to
establish that--as of early 1969--National Gypsum began using
SG-210 exclusively in its joint compound formula.   *See* ECF No.
183 at 11.   However, in the deposition testimony to which Mr.
Sherin refers, Doty is reading from a Regional Plant Manager's

Meeting Report about National Gypsum's West Coast operations. *See* ECF Nos. 186-1 at 2-3, 183-14 at 5-6.  National Gypsum supplies to the Baltimore area would not have shipped from its West Coast operations, but from its Baltimore plant.  *See* ECF Nos. 186 at 4 n.6, 186-1 at 6.

Mr. Sherin has produced business records showing Union Carbide's sales of SG-210 to National Gypsum's Baltimore plant from 1969 until 1976.  *See* ECF No. 183-18.[35]  The earliest recorded shipment occurred in April 1969, *see id.* at 23, around the time construction began on the Brattle Road home, *see* ECF No. 183-2.[36]  Although Mr. Sherin has not produced evidence that Calidria shipped in April 1969 was mixed into the joint compound formula used at the Brattle Road home in 1969,[37] he has raised a genuine dispute of material fact over whether it was.

Based on the foregoing evidence, though a jury could not reasonably infer that Mrs. Sherin inhaled Calidria asbestos dust

---

[35] The business records primarily contain invoices dated 1971 to 1975.  *See* ECF No. 183-18.  Union Carbide's sales ledger, however, reflects shipment of Calidria to National Gypsum's Baltimore plant in April, 1969.  *See id.* at 23, 42.

[36] Mr. Sherin testified that construction began "maybe in the spring, spring of 1969," though he could not precisely recall. ECF No. 183-2 at 21.

[37] Mr. Sherin testified that the family moved in to the Brattle Road home "before 1970 . . . [o]r right at the beginning of 1970."  ECF No. 183-2 at 29.  It is reasonable to infer, then, that the application of joint compound during drywall installation occurred sometime in 1969.

from Georgia-Pacific joint compound at the Brattle Road worksite or from washing Mr. Sherin's work clothes prior to September 1970, a jury could find that Mrs. Sherin sustained take-home exposure after September 1970.  Furthermore, a jury could find that Mrs. Sherin inhaled Calidria asbestos dust from National Gypsum joint compound at the Brattle Road worksite and--from 1969 to 1976--from washing Mr. Sherin's work clothes.

iii.    Substantial Factor Causation

Union Carbide asserts that it is entitled to summary judgment because Mr. Sherin cannot show that Mrs. Sherin's exposure to Calidria, if any, was a substantial factor in causing Mrs. Sherin's mesothelioma.  *See* ECF No. 178-1 at 10-11. At best, Union Carbide asserts, Mr. Sherin has merely shown that Calidria "was incorporated in certain formulas, of certain manufacturers, at certain times."  *Id*. at 11.  Mr. Sherin asserts that expert medical testimony establishes that Mrs. Sherin was exposed to Union Carbide's asbestos "in quantities sufficient to have caused her malignant mesothelioma."  ECF No. 183 at 12-13.[38]

---

[38] Mr. Sherin contends that surviving a motion for summary judgment merely requires that it produce "some evidence" of exposure, and that the substantial factor determination is for the jury to decide.  *See* ECF No. 183 at 4.  Substantial factor causation may appropriately be determined--depending on the evidence or lack thereof--at the summary judgment stage.  *See AC and S, Inc.*, 947 A.2d at 572 (2008) (resolving substantial factor causation in favor of defendant on motion for summary

Under Maryland law, the plaintiff must show that the defendant's asbestos was a substantial factor in causing her harm. *See Shetterly v. Raymark Indus., Inc.*, 117 F.3d 776, 780 (4th Cir. 1997); *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162 (4th Cir. 1986). In this case, because Mrs. Sherin did not work directly with asbestos products, she is considered a "bystander." *See Balbos*, 604 A.2d at 460.

Whether a bystander's exposure to asbestos products is legally sufficient to find substantial-factor causation is fact specific. *See id.* Factors to consider include the frequency of the asbestos product's use, the regularity of a plaintiff's exposure, and the time and distance proximity of a plaintiff to the product's use. *See id.; Reiter v. AC and S, Inc.*, 947 A.2d 570, 572 (Md. 2008), *aff'd sub nom. Reiter v. Pneumo Abex, LLC*, 417 Md. 57, 8 A.3d 725 (Md. 2010) (evidence that plaintiffs worked in "same massive facility" as cranes allegedly releasing asbestos fibers insufficient to find substantial factor causation).[39] Evidence concerning medical causation must also be

---

judgment); *see also Harper v. Anchor Packing Co.*, No. GLR-12-460, 2014 WL 3828387 (D. Md. Aug. 1, 2014) (same).

[39] *See also Pransky*, 800 A.2d at 724. In *Pransky*, the daughter of a heating and air conditioning contractor argued that her mesothelioma was caused by exposure to asbestos-containing dust generated by her father's several-month long conversion of their basement to a recreation room, and for the next ten years by dust emanating from the compound used on the ceiling. *Id.* at 723-24. The *Pransky* court found there was sufficient evidence

considered. *See Georgia-Pac. Corp. v. Pransky*, 800 A.2d 722, 725 (Md. 2002) (*citing Lockwood v. AC & S, Inc.*, 744 P.2d 605, 613 (Wash. 1987)).

Mr. Sherin has provided sufficient evidence for a jury to reasonably infer that the *Balbos* "regular, frequent, and proximate exposure" test is met. *See Balbos*, 604 A.2d at 460.

Here, Mr. Sherin testified that--between 1968 and 1976--he visited construction sites eight to ten times each month. ECF No. 183-2 at 53. Defining the relevant time period as 1969 to 1976,[40] and performing basic math, Mr. Sherin visited between 672 and 840 construction sites during that time. Mr. Sherin testified that he saw buckets of Georgia-Pacific and Gold Bond joint compound being used "[m]any times" during those visits. *Id.* at 57.[41] Dust from the joint compound adhered to his socks, shoes, pants, and jacket that were washed by Mrs. Sherin. *Id.* at 55, 52.

---

to affirm the jury's finding that Ms. Pransky's exposure to the defendant's asbestos was a substantial factor in causing her mesothelioma. *Id.* at 723-26.

[40] Because the Court has determined that Mr. Sherin's evidence is sufficient to find that Mrs. Sherin inhaled Calidria-containing asbestos dust from 1969 to 1976, this section will not consider her alleged exposure prior to 1969 for the purpose of determining whether there is sufficient evidence of substantial factor causation.

[41] Mr. Sherin further stated that "[o]n every job site, every house, [buckets of Georgia-Pacific and Gold Bond joint compound] were being used. Now, not every house had it, obviously. But it was so common, it's all over the place." ECF No. 183-2 at 54.

Mr. Sherin also offers medical testimony by Drs. Abraham and Kipen. *See* ECF Nos. 183-19, 183-20. Dr. Abraham testified that each exposure to asbestos fibers while washing Mr. Sherin's clothes would be a contributing cause of Mrs. Sherin's mesothelioma and that each exposure increases the risk of mesothelioma. ECF No. 183-19 at 11-12,14. Dr. Kipen testified that, in his opinion, Mrs. Sherin's mesothelioma resulted from her "cumulative exposure to asbestos dust" over many years of washing Mr. Sherin's clothes. *Id.* at 5-7 (describing Mrs. Sherin's exposure as "substantial domestic exposure").

From Mrs. Sherin's laundry exposure and the medical testimony, a jury could reasonably infer that Union Carbide's asbestos fiber was a substantial factor in causing Mrs. Sherin's mesothelioma.

### iv.   Tort Duty to Warn

Union Carbide asserts that it is entitled to summary judgment as it did not owe Mrs. Sherin a duty to warn her about the dangers of asbestos because her exposure to asbestos--and her development of mesothelioma--was not foreseeable. *See* ECF No. 178-1 at 12-13. Union Carbide also asserts that there was no feasible way for it to have warned Mrs. Sherin and that it

discharged its duty, if any, by reasonably relying on warnings

it provided to its customers. *See id.* at 15-18.[42]

      a.   Existence of the Duty

Union Carbide asserts that--before 1972--it did not owe

Mrs. Sherin a duty because the "generally available scientific

information had not yet clearly suggested that 'take-home'

exposures to asbestos were a potential health hazard." ECF No.

178-1 at 12.[43]  Union Carbide further asserts that--post-1972--

---

[42] Union Carbide further asserts that, even if it unreasonably relied on its customers to provide warnings about the danger of asbestos, Mr. Sherin must show "that the inadequate warning caused the injury." ECF No. 178-1 at 19. As authority, Union Carbide cites to *Ames v. Apothecon, Inc.*, 431 F. Supp. 2d 566, 573 (D. Md. 2006), a case involving a manufacturer's printed warnings on a prescription drug label. That case is inapposite here. *Ames* interpreted the "learned intermediary" doctrine applicable in the context of doctor-patient relationships. *See id.* ("[A] product defect claim based on insufficient warnings cannot survive summary judgment if stronger warnings would not have altered the conduct of the prescribing physician.") (alteration in original) (*quoting Motus v. Pfizer Inc.*, 358 F.3d 659, 661 (9th Cir.2004) ("Because the doctor testified that he did not read the warning label ... before prescribing the drug to Dr. Motus, the adequacy of Pfizer's warnings is irrelevant to the disposition of this case.")). Here, it is enough that Mr. Sherin shows (1) that Union Carbide owed a duty to warn, and (2) that Union Carbide failed to properly discharge its duty by unreasonably relying on its customers to provide the warning.

[43] Union Carbide relies on *Georgia Pac., LLC v. Farrar*, 69 A.3d 1028, 1037-38 (Md. 2013), for the proposition that, before 1972, it did not owe Mrs. Sherin a duty. In *Farrar*, although the Court discussed the state of scientific knowledge before the 1972 regulations issued by the Occupational Safety and Health Administration ("OSHA"), it resolved the issue on the grounds of impracticability of issuing a warning. *See id.* at 1039 ("[E]ven if Georgia Pacific should have foreseen back in 1968-69 that individuals such as Ms. Farrar were in a zone of danger, there

Mr. Sherin's presence on worksites, giving rise to the take-home exposure, was not foreseeable. *Id.* at 13.  Mr. Sherin contends that Union Carbide was aware of the dangers of take-home exposure to asbestos in 1967, and, thus, that Mrs. Sherin's exposure was foreseeable. *See* ECF No. 183 at 44.[44]

"The existence of a legal duty is a question of law, to be decided by the court." *Gourdine v. Crews*, 955 A.2d 769, 775 (Md. 2008) (*citing Doe v. Pharmacia & Upjohn Co., Inc.*, 879 A.2d 1088, 1092 (Md. 2005)).[45]  Under Maryland law, foreseeability of harm is a crucial--though not sole--factor in determining

---

was no practical way that any warning given by it to any of the suggested intermediaries would or could have avoided that danger.").

[44] Mr. Sherin also relies on *Farrar*, wherein the Court observed that liability arising from pre-1972 exposures was less likely to attach "at least in the absence of evidence that the defendant was aware, or should have been aware, of the danger *to household members* at the time." *Farrar*, 69 A.3d at 1038. Because, Mr. Sherin argues, Union Carbide was aware of the danger to household members, *Farrar's* focus on the 1972 OSHA regulations is not dispositive here. *See* ECF No. 183 at 43-45.

[45] The standard to be applied in failure to warn cases sounding in strict liability and negligence is the same. *See Kennedy v. Mobay Corp.*, 579 A.2d 1191, 1198 (Md. 1990)("Maryland has long recognized a duty on the part of sellers to warn of latent dangers attendant upon a proper use of the products they sell, where injury is foreseeable. The standard applied in that regard, under all three theories of negligence, breach of implied warranty, and strict liability, has been that stated in Restatement (Second) of Torts § 388.") (*quoting Dechello v. Johnson Enterprises*, 536 A.2d 1203 (Md. Ct. Spec. App. 1988)). Under either theory, the key inquiry is, "Was the warning adequate?" *Id.* (*quoting Werner v. Upjohn Co., Inc.*, 628 F.2d 848, 858 (4th Cir.1980)).

whether a defendant had a duty to warn those who might suffer
harm from the defendant's conduct.  *See Georgia Pac., LLC v.
Farrar*, 69 A.3d 1028, 1033 (Md. 2013).[46]  Foreseeability of harm
turns (1) on what "the supplier knew or had 'reason to know'"
about the dangers of asbestos when the warning should have been
given,[47] and (2) whether "the defendant should have recognized"
that the plaintiff was "in a significant zone of danger."[48]
*Farrar*, 69 A.3d at 1034; *Balbos*, 604 A.2d at 454.

---

[46] *See also Henley v. Prince George's Cnty.*, 503 A.2d 1333, 1340-
41 (Md. 1986) ("[T]he question of foreseeable identification of
a plaintiff" is particularly "relevant to the determination of
the existence of a *duty to warn*.").

[47] A supplier has "reason to know" when "it has information from
which a person of reasonable intelligence or of the superior
intelligence of the actor would infer that the fact in question
exists, or that such person would govern his conduct upon the
assumption that such fact exists."  Eagle-Picher Indus., Inc. v.
Balbos, 604 A.2d 445, 454 (Md. 1992) (*quoting* Restatement
(Second) of Torts: Reason to Know; Should Know § 12 (1965)).

[48] In *Farrar*, the Court adopted the Restatement view on
foreseeability:
> The general standard . . . ., clearly applicable to
> product liability cases and, in particular, to
> exposure to asbestos, is stated in § 388 of the
> Restatement (Second) of Torts--that the duty extends
> "to those whom the supplier should expect to use the
> chattel" with the consent of the person to whom it is
> supplied "or to be endangered by its probable use."
> Comment d. to § 388 emphasizes that the supplier is
> subject to liability "not only to those for whose use
> the chattel is supplied but also to third persons whom
> the supplier should expect to be endangered by its
> use."

*Id.* at 1033-34 (footnote omitted) (*quoting* Restatement (Second)
of Torts: Chattel Known to be Dangerous for Intended Use § 388
(1965)).

There is no duty to warn, however, if the warning cannot feasibly be implemented or have practical effect. *Farrar*, 69 A.3d at 1039 (trial court erred in finding a duty to warn in 1968-69 because "there was no practical way that any warning given by [the defendant] to any of the suggested intermediaries would or could have avoided that danger").

Here, Mr. Sherin has presented sufficient evidence from which a jury could reasonably infer that Union Carbide knew or had reason to know of the dangers of household exposure to asbestos before 1972.

The 1947 Dust Investigation Report prepared by IHF stated that information available then "[did] not permit complete assurance that five million [particles per cubic foot][49] is thoroughly safe nor has information been developed permitting a better estimate of safe dustiness." ECF No. 183-25 at 4, 23. Similarly, in 1956, Henry Field Smith, Jr., Ph.D.'s journal article for Union Carbide and the Mellon Institute stated that threshold limits and maximum allowance concentrations were misleading. *See* ECF no. 183-29 at 3.

On the issue of take-home exposure, Mr. Sherin presented the 1967 Sayers Report, which states that mesothelioma is

---

[49] The maximum allowable concentration standard for asbestos dust recommended at the time by the American Conference of Governmental and Industrial Hygiene. *See* ECF Nos. 183-25 at 22, 183 at 15.

associated with inhaling asbestos; that "[m]esothelioma is the most disturbing" of diseases attributable to asbestos; and that it can occur after "brief exposure," possibly as low as "three months," or, according to "[s]ome authorities[,] . . . a single brief exposure might be sufficient." ECF No. 183-36 at 11. The Sayers Report mentions an October 31, 1965 *Sunday Times* article describing a case of a dock worker's wife who died of mesothelioma after asbestos exposure from washing her husband's work clothes. *See id.* at 4. In June 1967, Dr. Dernehl found the Sayers Report "reasonably accurate." ECF No. 183-38 at 1. Dr. Dernehl stated "[i]t is probable that the 5 million particles per cubic foot will not be acceptable for the prevention of mesothelioma." *Id.* at 2.

Based on the foregoing, the Court finds that a jury could reasonably infer that Union Carbide had, as Mr. Sherin asserts, "clear notice of the dangers of 'take-home' exposures" before 1972.

Mr. Sherin presented additional evidence to support his assertion that Union Carbide's awareness of the dangers of exposure to asbestos dust increased throughout the 1970s. For example, Mr. Sherin presented the 1972 "Asbestos Article" warning about the danger from slight exposure to asbestos, including take-home exposure. *See* ECF No. 183-55. Mr. Sherin also relies on the May 1973 letter prepared by Union Carbide's

Medical Department disagreeing with the Mining and Metals Division's conclusions resulting from its Calidria Asbestos study. *See* ECF No. 183-59. The Medical Department compared the Mining and Metals Division's conclusions with criteria for asbestos set forth by NIOSH and found that its conclusions minimized the health hazards associated with asbestos exposure. *See id*. at 1-2, 4-5.

The Court is not persuaded by Union Carbide's assertion that Mr. Sherin's presence on worksites was not foreseeable. ECF No. 178-1 at 13. Mr. Sherin visited worksites to convince builders to install his products at the builders' next construction locations. *See* ECF No. 183-2 at 36. These visits were not uncommon; they occurred eight to ten times per month. *See id*. at 53. Thus, from the evidence of awareness of take-home exposure and Mr. Sherin's job, a jury could reasonably find that Union Carbide knew or should have known of the dangers of take-home asbestos exposure after 1972.

Before imposing a duty to warn, however, the Court must satisfy itself that Union Carbide could have feasibly and effectively implemented that duty. *See Farrar*, 69 A.3d at 1039. Union Carbide asserts that Mr. Sherin has provided no evidence of a "feasible way for Union Carbide to have warn[ed] Mrs. Sherin." ECF No. 186 at 10. *Farrar*, however, does not require Union Carbide to have reached Mrs. Sherin directly. The *Farrar*

Court stated that "there was no practical way that any warning given by [Georgia-Pacific] *to any of the suggested intermediaries* would or could have avoided that danger." *Farrar*, 69 A.3d at 1039 (emphasis added).  *Farrar*, thus, leaves open the possibility that the feasibility of the warning may be determined by assessing whether the defendant could feasibly have better warned its intermediaries.

Mr. Sherin does not directly address *Farrar*'s holding about feasibility of warnings.[50]  Mr. Sherin asserts, however, that Union Carbide "affirmatively deceived its customers about the hazards of Calidria Asbestos" and "had ample opportunity and ability to provide warnings about the hazards of asbestos and the potential harm to users."  ECF No. 183 at 32, 35.  Drawing all reasonable inferences in Mr. Sherin's favor, *see Dennis*, 290 F.3d at 645, Mr. Sherin's assertions could be construed as an argument that Union Carbide could feasibly have issued better warnings to its customers.

Union Carbide asserts that it warned its customers of the dangers of asbestos and provided safe-handling instructions. *See* ECF No. 178-1 at 16.  Beginning in 1968, Union Carbide included warnings on its bags of Calidria asbestos and--in 1972--it modified the warning to comply with newly-enacted OSHA

---

[50] Mr. Sherin's discussion of *Farrar* is limited to the Court's discussion of pre-1972 liability.  *See* ECF No. 183 at 43-45.

regulations. *See* ECF No. 178-1 at 18. Union Carbide internal correspondence states, however, that the 1968 labeling used on its asbestos packaging was "weak." See ECF No. 183-79 at 31.[51]

As further support of the adequacy of its warnings, Union Carbide presented an affidavit by John L. Myers, a former Union Carbide employee. *See* ECF No. 178-4. Myers states that Union Carbide provided its customers with various regulations, reports, and literature about health risks associated with asbestos. *See id.* at 6. Beginning in 1964, Union Carbide provided its Asbestos Toxicology Report to all customers. *Id.* at 5. In 1972, Union Carbide began providing customers with its Calidria Data Sheet. *Id.* at 6.

Mr. Sherin disputes the adequacy of Union Carbide's warnings, asserting that Union Carbide deliberately misled its customers on the dangers of asbestos and "provide[d] the least amount of information possible." *See* ECF No. 183 at 27, 36. In support, Mr. Sherin points to internal Union Carbide documents. In 1972, Union Carbide's Mining and Metals Division recommended responding to a customer's concerns by stating that "[a]sbestos is proven harmful only when TLV's are exceeded for 10-30 years"

---

[51] Mr. Sherin has presented deposition testimony by Georgia-Pacific employees who handled bags of Calidria asbestos and who stated that they did not recall seeing any warnings printed on the bags or receiving information from Union Carbide about the health hazards of asbestos. *See* ECF Nos. 183-73 at 3, 183-74 at 2.

and that "[i]t is not a proven fact that asbestos dust causes cancer when regulations are observed." ECF No. 183-50 at 1. In 1973, Union Carbide directed personnel to inform customers that "asbestos is not a carcinogen" under OSHA regulations, while acknowledging "[a]s you know, the answer to the same question in the broad sense is not as clear-cut," and medical opinion varies from "[a]sbestos is a very dangerous carcinogen" to "[u]nder certain exposure conditions certain types of asbestos may be carcinogenic." ECF No. 183-60 at 1.

Mr. Sherin also presents Union Carbide "Reports of Call" suggesting Union Carbide customer dissatisfaction with the information they had received. *See* ECF Nos. 183-45, 183-49. In one Report of Call, the customer apparently stated that "the only information that Carbide has furnished him with regard to this subject in print is our Asbestos Toxicology report and some information concerning methods and equipment for determining dust levels." ECF No. 183-49 at 1. The customer described the Asbestos Toxicology Report as "atrocious," said that that it posed more questions than it answered, and requested more specific recommendations for safe use of Calidria. *Id.*

Mr. Sherin asserts that the Calidria Data Sheet stated that Calidria contained no hazardous ingredients, *see* ECF Nos. 183 at 25, 183-56, although it provided guidance on airborne exposure to asbestos and noted that "[p]rolonged overexposure may result

43

in lung damage." ECF No. 183-56. Mr. Sherin asserts that the list of documents provided to Union Carbide customers was inadequate to fully inform them of the dangers of asbestos. *See* ECF No 27. For example, the 1967 Sayers Report was not distributed to customers. *See* ECF No. 183 at 19, 183-39 at 18.

Based on the foregoing, a jury could reasonably infer that it was feasible for Union Carbide to more fully inform its customers about the health hazards associated with asbestos dust. Under *Farrar*, however, Mr. Sherin must also provide evidence that improved warnings would have effectively prevented Mrs. Sherin's take-home exposure to asbestos dust.[52] Mr. Sherin has not provided any evidence that better warnings by Union Carbide would have altered Mrs. Sherin's take-home exposure.[53]

---

[52] In *Farrar* the Court granted summary judgment for the defendant when

> The best that the plaintiff offers in her brief was for Georgia Pacific to have "spread the word" to distributors of the product, the owners of land on which the product was used, contractors who supervised the workers, and union officials, and rely on them to inform everyone working in the vicinity of asbestos. Presumably, the word to be spread was that asbestos dust collected on work clothes could be dangerous if brought into the home.

*Farrar*, 69 A.3d at 1039.

[53] Union Carbide sold asbestos to product manufacturers, which sold finished products to suppliers; the suppliers sold the products to contractors; these contractors used the products that exposed Mrs. Sherin to asbestos at the new home and on Mr. Sherin's clothing. *See* ECF No. 178-1 at 16.

Thus, this Court will grant Union Carbide's motion for summary judgment on the issue of its duty to warn Mrs. Sherin.[54]

C.   Union carbide's Motion for Partial Summary Judgment

Union Carbide seeks partial summary judgment on claims involving breach of warranty, fraud, conspiracy, aiding and abetting, and punitive damages. *See* ECF No. 181. That motion is unopposed, and there is no evidence in the record supporting those claims. Accordingly, Union Carbide's motion for partial summary judgment will be granted.

III. Conclusion

For the reasons stated above, the motion *in limine* will be denied, the motion for summary judgment will be granted in part and denied in part, and the motion for partial summary judgment will be granted.

_____
9/16/14
Date

_____
William D. Quarles, Jr.
United States District Judge

---

[54] Because this Court finds that Union Carbide did not owe Mrs. Sherin a duty to warn, it will not consider Union Carbide's alternative reliance on the sophisticated user defense.